Citation Nr: 1237379 
Decision Date: 10/31/12 Archive Date: 11/09/12

DOCKET NO. 09-25 175 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in St. Petersburg, Florida


THE ISSUES

1. Entitlement to a disability rating in excess of 10 percent for service-connected right knee disability.

2. Entitlement to a disability rating in excess of 10 percent for service-connected left knee disability.


REPRESENTATION

Veteran represented by: Florida Department of Veterans Affairs


WITNESSES AT HEARING ON APPEAL

Veteran and his spouse



ATTORNEY FOR THE BOARD

James Alsup, Counsel


INTRODUCTION

The Veteran served on active duty from June 1993 to June 1997.

This matter comes before the Board of Veterans' Appeals (the Board) on appeal from rating decisions of the Department of Veterans Affairs (VA) Regional Office (RO) in St Petersburg, Florida.

The Veteran's June 2008 claim for entitlement to increased disability ratings for service-connected bilateral knee disabilities was denied in an October 2008 rating decision. The Veteran disagreed and perfected an appeal. The Veteran had bilateral knee arthroscopic knee surgery in August 2009, and the RO provided the Veteran with temporary 100 percent disability between August 18, 2009, and October 31, 2009. The Veteran's disability rating returned to a 10 percent disability rating effective December 1, 2009.

In April 2011, the Veteran and his wife presented testimony and documents in support of his claim at a hearing at the RO before the undersigned Veterans Law Judge. A transcript of that hearing has been included in the Veteran's VA claims folder.

In an October 2011 decision, the Board remanded the Veteran's claim for further development.


FINDINGS OF FACT

1. The Veteran's service-connected right knee disability is manifested by clinical evidence of knee pain, occasional swelling, edema and tenderness of the knee joint, with extension at its worst to 0 degrees, flexion at its worst to 80 degrees, x-ray evidence of osteoarthritis and is status post-right lateral meniscectomy synovitis.

2. The Veteran's service-connected left knee disability is manifested by clinical evidence of knee pain, occasional swelling and tenderness of the knee joint, with extension at its worst to 0 degrees, flexion at its worst to 85 degrees, x-ray evidence of osteoarthritis and is status post-left medial meniscectomy synovitis.

3. The medical evidence does not show subluxation, lateral instability, ankylosis, nonunion or malunion of the tibia and fibia, or genu recurvatum in either of the Veteran's service-connected knees.


CONCLUSIONS OF LAW

1. The criteria for a disability rating in excess of 10 percent for service-connected right knee disability are not met. 38 U.S.C.A. § 1155 (West 2002); 38 C.F.R. §§ 4.7, 4.10, 4.45, 4.71a, Diagnostic Code 5259 (2012); Hart v. Mansfield, 21 Vet App. 505 (2007).

2. The criteria for a separate 10 percent, but not higher, disability evaluation based on arthritis of the right knee are met. 38 U.S.C.A. § 1155 (West 2002); 38 C.F.R. §§ 4.7, 4.10, 4.45, 4.71a, Diagnostic Code 5003, 5260 (2012) .

3. The criteria for a disability rating in excess of 10 percent for service-connected left knee disability are not met. 38 U.S.C.A. § 1155 (West 2002); 38 C.F.R. §§ 4.7, 4.10, 4.45, 4.71a, Diagnostic Code 5259 (2012); Hart v. Mansfield, 21 Vet App. 505 (2007).

4. The criteria for a separate 10 percent, but not higher, disability evaluation based on arthritis of the left knee are met. 38 U.S.C.A. § 1155 (West 2002); 38 C.F.R. §§ 4.7, 4.10, 4.45, 4.71a, Diagnostic Code 5003, 5260 (2012).




REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

The Veteran generally contends that his service-connected bilateral knee disabilities have worsened after 2009 arthroscopic surgeries. He seeks a disability rating in excess of the currently assigned 10 percent disability rating. The Board will first address preliminary matters and then render a decision on the issues on appeal.

In Stegall v. West, 11 Vet. App. 268, 271 (1998), the United States Court of Appeals for Veterans Claims (Court) held that compliance with remand instructions is neither optional nor discretionary and that the Board errs as a matter of law when it fails to ensure compliance with remand orders. Although VA is required to comply with remand orders, it is substantial compliance, not absolute compliance that is required. See Dyment v. West, 13 Vet.App. 141, 146-47 (1999) (holding that there was no Stegall violation when the examiner made the ultimate determination required by the Board's remand, because such determination "more that substantially complied with the Board's remand order").

The Board remanded the Veteran's claim in an October 2011 decision that required VA to request that the Veteran identify any further treatment records pertaining to his service-connected knee disabilities, obtain VA treatment records from November 2009, and later, and to provide the Veteran with a VA examination that addressed whether the Veteran's knee disabilities manifested arthritis, lateral instability and nerve damage, and whether the knees manifested functional loss due to weakness, fatigability, incoordination or pain on movement. Review of the record shows that treatment records from Bay Pines VA Medical Center from November 2009 were obtained and reviewed and the record now includes a November 2011 examination report which addresses whether the Veteran's bilateral knees manifest arthritis, lateral instability or nerve damage and whether the Veteran's knees manifested functional loss due to weakness, fatigability, incoordination or pain on movement. For the reasons stated in detail below, the Board finds that the examination in conjunction with other medical records is sufficient to render a decision on the issues on appeal as it was based on a review of the history, a physical examination, and as it provides sufficient information for the Board to render an informed determination. Accordingly, the Board finds that VA has substantially complied with the October 2011 Board remand.

Upon receipt of a substantially complete application for benefits, VA must notify the claimant what information or evidence is needed in order to substantiate the claim and it must assist the claimant by making reasonable efforts to get the evidence needed. 38 U.S.C.A. §§ 5103(a), 5103A; 38 C.F.R. § 3.159(b); see Quartuccio v. Principi, 16 Vet. App. 183, 187 (2002). The notice required must be provided to the claimant before the initial unfavorable decision on a claim for VA benefits, and it must (1) inform the claimant about the information and evidence not of record that is necessary to substantiate the claim; (2) inform the claimant about the information and evidence that VA will seek to provide; and (3) inform the claimant about the information and evidence the claimant is expected to provide. 38 U.S.C.A. §§ 5103(a); 38 C.F.R. § 3.159(b)(1). 

The Veteran was notified in a June 2008 letter of the evidence required to substantiate a claim for an increased disability rating and how VA determines a disability rating and an effective date for a claimed disability. The Veteran was told of the steps VA would take to assist him in developing his claim, including providing him with a medical examination and obtaining pertinent records from VA, military and other federal and state agencies, and from private medical or employment providers. 

The Board observes that the Veteran has neither alleged nor demonstrated any prejudice with regard to the content or timing of notices provided by the RO. See Shinseki v. Sanders, 556 U.S. 396 (2009) (Reversing prior case law imposing a presumption of prejudice on any notice deficiency, and clarifying that the burden of showing that an error is harmful, or prejudicial, normally falls upon the party attacking the agency's determination.). See also Mayfield v. Nicholson, 444 F.3d 1328, 1333-34 (Fed. Cir. 2006).

The record shows that VA obtained the Veteran's service treatment records, VA treatment records and private medical records that were identified by the Veteran. As noted above, the Veteran received VA medical examinations, including that provided in November 2011. As indicated in the Introduction, the Veteran provided testimony at a hearing before the undersigned in April 2011. 

At the hearing, the Veteran testified that his knees would occasionally feel as though they were locking. See for example hearing testimony at page 24. The Veteran recently submitted a July 2012 statement that indicates, among other things, that he experiences locking of the knee. The statement was not submitted with a waiver of first consideration by the RO. See 38 C.F.R. § 20.1304(c) (2011). The Board observes, however, that the evidence provided in the statement is repetitive of evidence previously provided and considered by the RO. Therefore, the Board finds that consideration of such evidence does not prejudice the Veteran.

The United States Court of Appeals for Veterans Claims has held that the VLJ or RO official who conducts a hearing must comply with 38 C.F.R. § 3.103(c)(2) by (1) fully explaining the issues and (2) suggesting the submission of evidence that may have been overlooked. See Bryant v. Shinseki, 23 Vet. App. 488 (2010). The undersigned VLJ informed the Veteran of the issue on appeal as "increased ratings for his knee disabilities," and the Veteran was informed that his knees were rated as 10 percent disabling. See April 2011 hearing transcript at page 3. The responses by the Veteran's representative and the testimony of the Veteran combine to demonstrate that the Veteran was aware of what the issues on appeal were during the hearing and what evidence needed to be presented to substantiate the claims. The VLJ also asked the Veteran where he had been treated for his knee disabilities and ascertained that that the Veteran had presented everything he had intended to present at the hearing. See hearing transcript at page 29. Neither the Veteran nor his representative has contended that VA failed to comply with the Court's guidance in Bryant or failed to satisfy the requirements of 38 C.F.R. § 3.103(c)(2) and they have not contended that the Veteran was prejudiced in any way as a result of the hearing. The Board finds that 38 C.F.R. § 3.103(c)(2) has been satisfied. 

For those reasons, the Board finds that VA satisfied the duties to assist and notify the Veteran. The Board will proceed to a decision on the claims on appeal.

The Veteran's claims were received by VA in June 2008. The Veteran's service-connected knees are each evaluated as 10 percent disabling under the criteria of 38 C.F.R. § 4.71a, Diagnostic Code 5259 (2011) [Cartilage, semilunar, removal of, symptomatic]. The 10 percent disability ratings have been in effect since June 1997, except for a period between August and November 2009 when the Veteran was assigned a temporary 100 percent disability rating while he convalesced after arthroscopic surgery on both knees in August 2009. The Veteran essentially contends that VA has not rated all of the service-connected knees' symptoms and he seeks disability ratings for those symptoms.

Disability evaluations are determined by the application of the VA's Schedule for Rating Disabilities (Rating Schedule), 38 C.F.R. Part 4 (2011). The percentage ratings contained in the Rating Schedule represent, as far as can be practicably determined, the average impairment in earning capacity resulting from diseases and injuries incurred or aggravated during military service and their residual disorders in civil occupations. 38 U.S.C.A. § 1155; 38 C.F.R. §§ 3.321(a), 4.1 (2011). The Court has held that evaluation of a service-connected disability involving a joint rated on limitation of motion requires adequate consideration of functional loss due to pain under 38 C.F.R. § 4.40 (2011) and functional loss due to weakness, fatigability, incoordination or pain on movement of a joint under 38 C.F.R. § 4.45 (2011). See, in general, DeLuca v. Brown, 8 Vet. App. 202 (1995).

The provisions of 38 C.F.R. § 4.40 state that the disability of the musculoskeletal system is primarily the inability, due to damage or infection in parts of the system, to perform the normal working movements of the body with normal excursion, strength, speed, coordination, and endurance. According to this regulation, it is essential that the examination on which ratings are based adequately portrays the anatomical damage, and the functional loss, with respect to these elements. In addition, the regulations state that the functional loss may be due to pain, supported by adequate pathology and evidenced by the visible behavior of the veteran undertaking the motion. See 38 C.F.R § 4.40 (2011).

The provisions of 38 C.F.R. § 4.45 state that when evaluating joints, inquiry will be directed as to whether there is less movement than normal, more movement than normal, weakened movement, excess fatigability, incoordination, and pain on movement. The intent of the schedule is to recognize painful motion with joint or periarticular pathology as productive of disability. It is the intention to recognize actually painful, unstable, or malaligned joints, due to healed injury, as entitled to at least the minimum compensable rating for the joint. 38 C.F.R. § 4.59 (2011).

As noted, the Veteran's bilateral knee disabilities were evaluated under the criteria of Diagnostic Code 5259. The assignment of a particular diagnostic code is "completely dependent on the facts of a particular case." See Butts v. Brown, 5 Vet. App. 532, 538 (1993). One diagnostic code may be more appropriate than another based on such factors as an individual's relevant medical history, the diagnosis and demonstrated symptomatology. Any change in a diagnostic code by a VA adjudicator must be specifically explained. Pernorio v. Derwinski, 2 Vet. App. 625, 629 (1992). As explained below, evaluation of the knee joints may involve several different rating criteria, some of which may be applicable in addition to Diagnostic Code 5259. The Board will review the medical evidence and determine the applicability of several diagnostic codes that address various knee disabilities to the facts presented in the Veteran's case.

The medical evidence includes the reports of a September 2008 VA examiner and a November 2011 VA examiner. The Board's October 2011 remand, however, notes that the Veteran had arthroscopic surgery involving both knees in August 2009 after the first VA examination, and he contended that his knees had gotten worse after the surgeries. 

The September 2008 VA examiner did not have the Veteran's VA claims folder to review. The examiner noted the Veteran's description of "almost constant" bilateral knee pain that was described to be 7 out of 10. The examiner stated that the Veteran did not report experiencing flare-ups, but did complain of decreased range of motion, laxity, clicking and swelling of the knees. The Veteran told the examiner that he used knee braces about once a week, but did not use a cane or other assistive device. The Veteran stated that at as a mechanic, he avoided putting cars on a lift by himself and avoided kneeling. The examiner stated that the impact of the bilateral knee disability on the Veteran's ability to perform daily activities were that he avoided kneeling, long walks, squatting and stairs. The examiner used a goniometer and reported right knee range of motion including flexion of 0-to-80 degrees and left knee range of motion of 0-to-85 degrees. Both ranges of motion were limited by pain. The examiner noted that both knees were stable after testing, and the examiner did not observe that either knee manifested weakness or tenderness. The examiner observed no additional loss of bilateral knee function due to pain, fatigue, weakness, lack of endurance, or incoordination following repetitive use. The Veteran presented a "limping gait" due to his knees. X-ray evidence showed DJD of both knees.

The November 2011 examiner reported that the Veteran complained of knee pain, with severe pain during flare-ups that occurred three times a week for the right knee and two times a month for the left knee. The Veteran did not know the effects of flares on range of motion or if the flares impaired knee function. The examiner noted that there was no complaint that the Veteran's knees gave way or were unstable. The examiner noted the Veteran had an antalgic gait. The examiner noted right medial and lateral knee tenderness to palpation without instability, patellar abnormality or evidence of nerve damage. The Veteran's right knee was able to extend to 0 degrees and flex to 105 degrees. The Veteran's left knee manifested crepitus without instability, patellar abnormality or evidence of nerve damage. The left knee was able to extend to 0 degrees and flex to 120 degrees. The examiner noted no objective evidence of pain on motion for either knee, no additional limitation of range of motion or knee function was noted after repetitive motion. No ankylosis was diagnosed. The examiner diagnosed the Veteran with "S/P [status post] bilateral meniscal repair with residuals."

The Veteran has contended in a July 2012 statement that the November 2011 examination is inadequate. Specifically, the Veteran stated that "[T]here were no tests or exams done in the standing position nor did the doctor ask me to walk or to do any sort of walking up or down stairs." Review of the examination report reveals that the examiner noted the Veteran's gait, but noted no other evidence of abnormal weight bearing. The Veteran's contention that the examination is inadequate because he did not walk up or down stairs ignores the fact that knee joint instability is assessed by performance of specific tests to determine if there is knee ligament laxity that is requisite to knee instability. As noted in the examination report, the testing is not done while the knee is weight bearing. The examination report shows that the examiner performed the knee stability tests and determined that there was no evidence of knee ligament laxity in either knee. Thus, the Veteran's contention that the November 2011 examination was inadequate is controverted by the information found in the report itself. The Board therefore finds that the examination is adequate for purposes of rating the Veteran's claims. Moreover, the Board finds credible, competent and probative the Veteran's reports of bilateral pain on use. 

For purposes of determining whether a particular diagnostic code is appropriate, the Board notes that 'meniscectomy' is defined as the excision of a meniscus (meniscus is a crescent-shaped type of cartilage found in certain joints), usually from a knee joint. Stedman's Medical Dictionary at page 1091 (27th ed., 2000). Arthroscopy is an endoscopic examination of the interior of a joint. Stedman's Medical Dictionary at page 151 (27th ed., 2000). Debridement is the removal of devitalized tissue and foreign matter. Stedman's Medical Dictionary at page 460 (27th ed., 2000).

An August 18, 2009, operative report describes the nature of arthroscopic surgery performed on the Veteran's knees. Specifically, the operation description shows that the arthroscopic surgery involved left knee medial meniscectomy and right knee lateral meniscectomy. The report indicates that a "posterior horn tear of the [left] medial meniscus with horizontal and vertical components" was observed and debrided. In addition, another entry was made and "further debridement [was] done of the pathologic medial meniscus" of the left knee. Arthroscopic inspection of the right knee showed that the medial meniscus was intact "throughout its entirety," but a tear "involving the mid and anterior third of the lateral meniscus" was observed, debrided and a "good stable peripheral rim was obtained." The report also states that the Veteran's right and left knee anterior and posterior cruciate ligaments were observed during the arthroscopy and were intact, and there was no evidence of "significant chondromalacia" in the left knee. The report did not indicate whether there was evidence of chondromalacia in the right knee. 

An August 21, 2009, check up report by Dr. O.M., M.D., a private physician who performed the arthroscopic surgery, states that the Veteran had "moderate swelling and moderate pain." An October 2009 VA treatment report states that the Veteran had "minimal pain" in the knees. A November 2009 VA Rheumatology consult report describes the Veteran's "b/l [bilateral] knees without crepitus on ROM [range of motion], no ligamental instability appreciated." 

February 2010 x-ray reports describe the Veteran's right knee and left knee as having "minimal degenerative changes but no evidence of fracture or effusion." A February 2010 VA treatment reports notes the Veteran's complaints of persistent bilateral knee pain and swelling following the arthroscopic surgery and that he had not improved since the surgery. The examination showed "mild swelling, pain w/ wt baring (sic) [with weight bearing], full ROM [range of motion], no laxity." A March 2010 VA orthopedic consult states that the Veteran was seen and examined and an impression of "post op synovitis both knees" was given. A May 2010 VA occupational therapy note states that the Veteran complained of "chronic b/l [bilateral] knee pain." An October 2010 VA primary care note states that the Veteran said that his knee "pain is minimal pain," that he was satisfied with current treatment and that there had been "no change in location, character, and no new neurologic changes." 

A January 30, 2011, VA emergency department note states that the Veteran complained of sharp and constant right knee pain "since yesterday after twisting it wrong." The note states that the Veteran felt right knee pain "after he feels his knee gave out," and further notes that the Veteran denied "any trauma or inciting factors," and that he had experienced similar episodes in the past. 

A March 2, 2011, VA treatment note states that the Veteran had a pending appointment with Dr. F. "at BPVA [Bay Pines VA] for his right knee, but is really having more problems with his right shoulder." The note included an impression of "osteoarthritis, knee B/L, stable, continue current TX [treatment]." Several notes indicate that the Veteran insisted on undergoing an MRI for his knees. A May 26, 2011, note by Dr. D.M., D.O., states that "MRI will not make his knee pain go away," and that physical therapy was indicated and suggested. 

A June 2011 VA physical therapy note reviewed the Veteran's February 2011 x-rays and reported the Veterans long history of bilateral knee pain. The Veteran described his pain then as 0 out of 10, and the pain at its worst 9 out of 10, often after standing, kneeling or twisting. The therapist observed "mild edema R [right] anterior knee," and "normal patellar tracking exhibited b/l [bilaterally]." The Veteran's range of motion was within normal limits, the knee strength was described as normal and the examiner noted "exquisite tenderness to palpation b/l patellar borders and medial joint lines." The examiner reported negative test results for McMurray's, LCL [lateral collateral ligament]/MCL [medial collateral ligament] and Lachman's. The examiner did note a postitive Clarke's sign. The therapist also noted that the Veteran "exhibits findings consistent with b/l knee djd [degenerative joint disease]." 

The records also include July 30, 2011, VA emergency department notes indicating that the Veteran complained of right knee pain "aggravated yesterday after being on the bike, noted sudden snap and rt knee giving way and immediate sharp/burning pain and swelling over the medial side, similar presentation in Jan., underwent x-rays, and ortho[pedic] consult and underwent physical therapy." Examination of the knee showed "tenderness, mild warmth and swelling medial aspect of rt knee no redness." The assessment was right knee pain "acute on chronic h/o [history of] djd." August 2011 MRI results were "essentially, showing chronic degenerative changes of the medial meniscus, no new acute ligament injury." 

The Veteran's wife submitted a statement indicating that the Veteran's knees were always painful, locked up and ached constantly. He sat in the bathtub everyday to soak them and it was painful for him to drive or ride in a car for over 20 minutes. The Veteran's mother also submitted a statement reporting that his knees were getting progressively worse over the last few years. He came home from work in bad pain, could not walk for long distances and his amount of activity was limited.

The Veteran and his wife testified before the undersigned in April 2011. The Veteran reported that he wore knee braces during the day for support. He indicated that he was not aware of any doctor reporting that he had lateral instability. The Veteran felt that his knee would shift so he would try not to do activities that would cause that. He also indicated that he was participating in Vocational Rehabilitation to work in radiology. His wife testified that he could not go out and practice with the kids because he could not kick a soccer ball around and run after it, nor could he throw the football or ride bikes. She also reported that his knee would lock up suddenly when she was walking with him. The Veteran reported that knee braces helped for a short period of time but if he left the brace on, his knee would swell. 

The medical evidence thus shows removal of portions of the Veteran's meniscus on both knees, limitation of knee flexion and x-ray evidence of degenerative joint disease of both knee joints, but the evidence does not show ankylosis, recurrent subluxation, malunion or nonunion of the tibia and fibula or genu recurvatum. For those reasons, the Board will address disability ratings under the criteria of Diagnostic Codes 5003 [arthritis, degenerative], 5260 [leg, limitation of flexion] and 5261 [leg, limitation of extension], in addition to Diagnostic Code 5259 [Cartilage, semilunar, removal of, symptomatic].

Under Diagnostic Code 5003, arthritis substantiated by x-ray findings will be rated on the basis of limitation of motion under the appropriate diagnostic code(s) for the specific joint(s) involved. When, however, the limitation of motion of the specific joint(s) involved is noncompensable under the appropriate diagnostic code(s), a 10 percent rating is for application for each such major joint or group of minor joints affected by limitation of motion, to be combined, not added under Diagnostic Code 5003. Limitation of motion must be objectively confirmed by findings such as swelling, muscle spasm, or satisfactory evidence of painful motion. In the absence of limitation of motion, with X-ray evidence of involvement of 2 or more major joints, with occasional incapacitating episodes, a 20 percent rating will be assigned. With X-ray evidence of involvement of 2 or more major joints, a 10 percent rating will be assigned. The 20 percent and 10 percent ratings based on X-ray findings will not be combined with ratings based on limitation of motion. See Diagnostic Code 5003, Note (1).

Under Diagnostic Code 5260, flexion of the leg limited to 60 degrees is assigned a noncompensable rating; flexion limited to 45 degrees is provided a 10 percent disability rating; flexion limited to 30 degrees is provided a 20 percent disability rating; and, flexion limited to 15 degrees is provided a maximum 30 percent disability. Under Diagnostic Code 5261, extension of the leg limited to 5 degrees is provided a noncompensable disability rating; extension limited to 10 degrees is provided a 10 percent disability rating; extension limited to 15 degrees warrants a 20 percent rating; extension is limited to 20 degrees is provided a 30 percent rating; where extension is limited to 30 degrees, a 40 percent rating is assigned; and, where extension is limited to 45 degrees, a 50 percent rating is assigned. 

VA's General Counsel has issued multiple opinions which are also relevant to the rating of the Veteran's left knee disabilities. The first indicates that a disability rated under Diagnostic Code 5257 may be rated separately under Diagnostic Codes 5260, limitation of flexion of the knee, and 5261, limitation of extension of the knee. See VAOGCPREC 23- 97. Another opinion states that separate disability ratings may be assigned under Diagnostic Code 5260 and Diagnostic Code 5261 for disability of the same joint without violating the provisions against pyramiding at 38 C.F.R. § 4.14 as long as each range is compensable under the applicable Diagnostic Code. See VAOPGCPREC 9-04. 

Read together, Diagnostic Code 5003 and 38 C.F.R. § 4.59 provide that painful motion due to degenerative arthritis, which is established by x-ray, is deemed to be limitation of motion and warrants the minimum compensable rating for the joint, even if there is no actual limitation of motion. Lichtenfels v. Derwinski, 1 Vet. App. 484, 488 (1991). The Court in Burton v. Shinseki, 25 Vet. App. 1 (2011), held that painful motion under 38 C.F.R. § 4.59 does not require arthritis for a minimum rating for a specific joint.

Diagnostic Code 5260

Normal range of knee motion is 140 degrees of flexion and zero degrees of extension. 38 C.F.R. § 4.71, Plate II (2011). The November 2011 VA examiner reported that the Veteran had right knee flexion to 105 degrees and left knee flexion to 120 degrees, and the examiner noted that the Veteran had no objective evidence of pain with repetitive motion of the knees. The September 2008 examination report indicated that the Veteran had flexion to 80 degrees on the right and to 85 degrees on the left. The June 2011 VA physical therapist described the Veteran's bilateral knee joint ranges of motion as "wnl [within normal limits]." A February 2010 VA treatment report states that the Veteran experienced pain, but had full range of motion; it is unclear from the report whether the Veteran experienced painful motion. A November 2009 VA treatment report states that the Veteran did not manifest crepitus with range of motion; the report does not indicate the degree of the Veteran's range of motion or characterize it as full or less than full range of motion.

Diagnostic Code 5260 provides for a noncompensable disability rating for flexion limited to 60 degrees. In order for flexion to be compensable, it needs to be limited to 45 degrees. In sum, there is no medical evidence that the Veteran had a limitation of flexion of either knee that approached 60 degrees. For those reasons, the Board finds that the criteria for a compensable disability rating for flexion under Diagnostic Code 5260 have not been met. The Board further finds that because the Veteran's limitation of flexion is not compensable, he would not be entitled to separate evaluations for limitation of extension and limitation of flexion. See VAOPGCPREC 9-04.

Diagnostic Code 5261

The medical evidence reports that the Veteran has consistently been able to fully extend his bilateral knees to 0 degrees. A compensable rating requires evidence of lack of extension beyond 10 degrees. Thus, the evidence does not show extension that meets the criteria for a compensable disability rating under Diagnostic Code 5261. 

Diagnostic Code 5003

As noted above, when a claimant shows x-ray evidence of arthritic degenerative changes, the rating official determines the level of disability by reference to the appropriate joint range of motion diagnostic code. If the claimant's limitation of joint motion does not meet the criteria for a compensable disability rating under the range of motion criteria, then Diagnostic Code 5003 provides for a 10 percent disability rating. In this case, the x-ray evidence shows that the Veteran has minimal degenerative changes in both knees. The provisions of Diagnostic Code 5003 apply in this case because, as demonstrated above, although the Veteran has limitation of motion on flexion bilaterally, the limitations do not meet compensable criteria for limitation of motion for either service-connected knee. For that reason, the Board finds that an additional 10 percent disability rating under Diagnostic Code 5003 is warranted for each knee. The currently assigned evaluation under Diagnostic Code 5259 does not contemplate limitation of motion due to arthritis, therefore, the assignment of separate ratings does not constitute pyramiding. See 38 C.F.R. § 4.14. 

Diagnostic Code 5257

The Veteran has contended that his knees give way causing him to fall or feel as though he will fall. See hearing transcript at page 22. Diagnostic Code 5257, knee, other impairment of: recurrent subluxation or lateral instability, provides disability ratings when there is evidence of recurrent subluxation or lateral instability. A disability rating of 10 percent is provided for slight instability, 20 percent for moderate instability and 30 percent for severe instability. 

As discussed above, the November 2011 VA examiner found no instability of either knee or subluxation of the knees. The June 2011 VA physical therapist listed negative results for the tests that would indicate lateral instability of the knees. The one test the Veteran for which positive results were reported by the physical therapist is a test that indicates chondromalacia may be manifested. The 2008 examiner found that both knees were stable with respect to the medial, lateral, anterior and posterior curiae ligaments. 

The August 2009 operation report states that the Veteran's ACL and MCL were intact. A November 2009 VA examiner reported that no instability was observed. A February 2010 VA examiner reported the Veteran had no knee joint laxity and February 2010 MRI results did not indicate ligament problems. Recurrent subluxation was not reported by the Veteran nor shown in the evidence. 

The Board acknowledges that the Veteran and his wife have reported subjective complaints of bilateral knee weakness, giving way, or falls during the pendency of the appeal. They are competent to report these symptoms. Davidson v. Shinseki, 581 F.3d 1313, 1315 (Fed. Cir. 2009). The Veteran's reports of bilateral knee weakness, giving way, or falls are likewise credible and probative. However, lay statements to the effect that there is lateral instability are outweighed by the medical assessments which found no instability with respect to the knees. The findings of the medical professionals are entitled to greater probative weight in this regard as the knees were examined specifically to determine whether there was lateral instability. Accordingly, separate evaluations are not warranted under Diagnostic Code 5257 for any period of time covered by the appeal, as the Board finds that the medical evidence which did not find lateral instability or recurrent subluxation outweighs the lay statements.

Diagnostic Codes 5258 and 5259

Diagnostic Code 5259 provides for a maximum of 10 percent disability for removal of semilunar cartilage from the knee joint. As noted above, the record shows that the Veteran has had partial meniscectomies of both knees and that he has residual symptoms of pain, locking, and swelling which results in the knees giving way. The Veteran already receives the regulatory maximum benefit under Diagnostic Code 5259.

Diagnostic Code 5258 provides a 20 percent evaluation for dislocated semilunar cartilage with episodes of pain, locking and effusion into the joint. The Veteran has testified that his knee joints lock and he has recently confirmed that symptom in a July 2012 statement. See hearing testimony at page 24. As above, the Board acknowledges that the Veteran is both competent to report such symptoms and credible in reporting them. However, as the Veteran is service connected for residuals of partial meniscectomies, and meniscectomies are rated pursuant to Diagnostic Code 5259, the Board finds that Code 5258 is inapplicable. 

The Board observes that the Veteran's statements regarding occasional swelling and increased pain and tenderness are contemplated by the rating criteria under which his disabilities are rated. Since the manifestation of limitation of motion is considered under other rating criteria, additional compensation under Diagnostic Code 5259 does not constitute pyramiding in violation of 38 C.F.R. § 4.14 (2011). 

DeLuca considerations

The Board has taken into consideration the provisions of 38 C.F.R. §§ 4.40 and 4.45. See DeLuca v. Brown, 8 Vet. App. 202 (1995). The June 2011 and November 2011 examiners both noted tenderness of the knee joints on palpation. The November 2011 examiner did not find that the Veteran's limitation of range of motion, particularly lack of range of flexion, was further limited by fatigability, incoordination, weakened movement and pain. The September 2008 examiner also did not find any additional functional limitations on repetitive use. 

The November 2011 examiner noted that the Veteran reported having flare-ups with increased knee pain that were exacerbated by "[R]andom Prolonged sitting/standing." The Veteran testified that he had swelling and could not bend his knees and had weakness in his knees making it difficult for him to comfortably walk up and down stairs. See hearing transcript at page 15. The Veteran has been issued knee braces and he occasionally uses them, but they appear to cause his knees to swell. See hearing transcript at page 23. The Veteran's wife testified that the Veteran's knees cause him extreme pain and prevent or make it difficult for him to play with his children or otherwise participate in normal daily activities such as shopping. See hearing transcript at pages 18-19.

Essentially, examiners reported that the Veteran ranges of motion are limited on flexion but not to a compensable degree. His extension was, however, normal. There is no report of additional limitation of motion after repetitive motion or on flare-ups either from medical professionals or the Veteran. The Board finds that there is no evidence of additional limitation of motion upon repetitive movement and no evidence of additional limitation of motion because of pain. The Veteran is already assigned separate 10 percent evaluations for painful motion resulting from osteoarthritis under Diagnostic Code 5003. An increased rating is not warranted as the Veteran's limitation of extension does not approximate 10 degrees due to weakened movement, fatigability, incoordination or pain on movement. Likewise, the limitation of motion on flexion is not to 30 degrees. 

The evidence also shows that the Veteran has normal muscle strength and atrophy was not reported. The 2011 examiner also determined there was no evidence of nerve damage. The other reported signs and symptoms including swelling and pain which ultimately result in reduced range of motion are contemplated by the currently assigned 10 percent ratings under Diagnostic Codes 5003 and 5259. Accordingly, a higher evaluation pursuant to the provisions of 38 C.F.R. § 4.40 and § 4.45 is not warranted.

Hart consideration

In Hart v. Mansfield, 21 Vet App. 505 (2007), the Court held that staged ratings are appropriate for an increased rating claim when the factual findings show distinct time periods where the service-connected disability exhibited symptoms that would warrant higher ratings. The evidence in this case, however, does not show that there are any periods of time during the claim period during which the criteria for higher ratings than those assigned are met. 

Extraschedular consideration

The Court of Appeals for Veterans Claims has clarified the analytical steps necessary to determine whether referral for extraschedular consideration is warranted. See Thun v. Peake, 22 Vet. App 111, 115-16 (2008). First, the RO or the Board must determine whether the evidence presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. Second, if the schedular evaluation does not contemplate the Veteran's level of disability and symptomatology and is found inadequate, the RO or Board must determine whether the claimant's exceptional disability picture exhibits other related factors such as those provided by the regulation as "governing norms." Third, if the rating schedule is inadequate to evaluate a Veteran's disability picture and that picture has attendant thereto related factors such as marked interference with employment or frequent periods of hospitalization, then the case must be referred to the Under Secretary for Benefits or the Director of the Compensation and Pension Service to determine whether, to accord justice, the Veteran's disability picture requires the assignment of an extraschedular rating.
 
In this case, the Veteran reported, and his employer confirmed, that he had difficulties performing all duties of his job in automotive repair. His wife testified at the hearing that the Veteran had begun to work half-days because of his knee disabilities. See hearing transcript at pages 18-19. He has reported various limitations, such as going up and down stairs, due to his knees which ultimately are contemplated by his painful movement due to arthritis. In addition, the residuals of the meniscectomies, including tenderness, swelling, and locking, are contemplated by the schedular criteria. There is no indication that there is otherwise an exceptional disability picture that is not contemplated by the rating criteria. Accordingly, referral for consideration of an extraschedular rating is not warranted. 

Individual unemployability

As noted, the Veteran was working part-time because of his knee pain and he testified that he intended to obtain training for a less strenuous occupation. A claim for a total disability rating due to individual unemployability (TDIU) is implied in a claim for increased rating. See Rice v. Shinseki, 22 Vet. App. 447 (2009). Where a veteran submits evidence of a medical disability, makes a claim for the highest rating possible, and submits evidence of unemployability, the requirement in 38 C.F.R. § 3.155(a) (2011) that an informal claim "identify the benefit sought" has been satisfied and VA must consider whether the veteran is entitled to TDIU. See Roberson v. Principi, 251 F.3d 1378 (Fed. Cir. 2001). The evidence of record reflects that the Veteran is currently employed and has not asserted that he is unemployable because of his bilateral knee disabilities. Accordingly, the issue of TDIU is not raised in this case.



ORDER

Entitlement to a disability rating in excess of 10 percent for service-connected right knee disability based on removal of meniscus cartilage is denied.

Entitlement to a separate disability rating of 10 percent for the service-connected right knee disability based on osteoarthritis is granted.

Entitlement to a disability rating in excess of 10 percent for service-connected left knee disability based on removal of meniscus cartilage is denied.

Entitlement to a separate disability rating of 10 percent for the service-connected left knee disability based on osteoarthritis is granted.




____________________________________________
S. S. TOTH
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs